## Case No. 15,536.

### UNITED STATES v. KING.

[Wall. Sr. 13.] [1]

Circuit Court, D. Pennsylvania. May 12, 1801.

DEBTS DUE UNITED STATES—PRIORITY—DISCHARGE IN BANKRUPTCY.

1. Debts due to the United States are not barred by a bankrupt's certificate.

[Cited in U. S. v. Herron, 20 Wall. (87 U. S.) 262.]

2. The United States have a preference in the payment of custom-house bonds, only in cases of notorious insolvency, such as assignment of the debtor's property, absconding, &c.

[Cited in brief in Field v. Geohegan, 125 Ill. 69, 16 N. E. 914; Jackson v. Davis, 4 Mackey, 198.]

This was an action of indebitatus assumpsit for moneys had and received to the use of the United States. It was an amicable suit, and the case was this. The United States had obtained judgments against the partnership of Johnson & Daniel King on certain custom-house bonds, and issued executions, which were levied on a cargo of wines from Cadiz, in the hands of the defendant [James King]. He claimed these wines under an assignment and bill of sale, from the house of Johnson & Co. antecedent to the judgments. The question was, whether, under certain acts of congress, the executions should have priority of the assignment; it being agreed, that if they had, the defendant would pay the amount from the proceeds in his hands. On the trial, which was long, the following points arose, and were ruled by the court unanimously:

1. Mr. Rawle, for the United States, offered as a witness, Johnson, one of the house of Johnson & King, and now a certificated bankrupt, to prove, that at the time when he and his partner, Daniel King, made the assignment of the wines in question to James King, the defendant, for a debt due to him by the partnership, to wit, on the 15th May, 1799, the house was in insolvent circumstances. [2]

Mr. Ingersoll, for defendant, objected to the witness on two grounds: (1) Because

---

1 [Reported by John B. Wallace, Esq.]

2 By certain acts of congress, hereinafter referred to, the United States have a preference of payment in case of debtors becoming insolvent, &c., and the point on this trial to be made out by the United States was, that at the time of assignment to James King, in payment of his debt, the house was insolvent; in which case it was contended, that by the acts of congress, the debts due on bond at the custom-house to the United States, had preference, and would overreach the assignment to James King.

it was the interest of Johnson, the bankrupt, that the United States should recover the amount of their judgments out of the property assigned to James King; for that as against the United States, he could not plead his certificate in bar of an action for these moneys; the United States, as Mr. Ingersoll contended, not being barred by the bankrupt law; whereas he could plead it against James King. He had therefore a direct interest in shifting his creditor by paying the debt due to the United States out of this fund, and defending himself as against King, by his certificate. (2) He maintained in the second place, that it was inadmissible evidence from Johnson, because, being party to the deed of assignment made to the defendant on the 15th May, 1799, it was not competent for him to prove the insolvency of the house at the time, and thereby defeat the security which he and his partner had given for a bona fide debt. On this point, he cited 1 Term R. 296. Mr. Rawle, contra, cited 3 Term R. 33, and 7 Term R. 601.

Mr. Rawle, for the United States, on the first objection, cited the sixty-second section of the bankrupt law [of April 4, 1800] which enacts, "that nothing contained in this law shall in any manner affect the right of preference to prior satisfaction of debts due to the United States, as secured or provided by any law heretofore passed, nor shall be construed to lessen or impair any right to, or security for, money, due to the United States, or to any of them." [1 Story's Laws, 750; 2 Stat. 36.] Sixty-third section. "And that nothing contained in this act shall be taken or construed to invalidate, or impair, any lien existing at the date of this act, upon the lands or chattels of any person who may become a bankrupt." [1 Story's Laws, 750; 2 Stat. 36.] He argued that the United States were bound by the certificate under the bankrupt law, as any other creditor was, as against the person and future effects of the bankrupt. That the sixty-second section was intended only to preserve to the United States in case of a bankruptcy, that preference of payment from the fund in the hands of the assignees, which by several acts of congress had been secured to them in case of insolvency, assignment to trustees by the debtor, attachment, or state bankruptcy, before the passing of the bankrupt law of the United States. See [Act Aug. 4, 1790 (1 Story's Laws, 147; 1 Stat. 169. § 45); Act May 2, 1792 (1 Story's Laws, 243; 1 Stat. 263, § 18); Act March 3, 1797 (1 Story's Laws, 465; 1 Stat. 515, § 5)],—by which acts, debts due to the United States for duties, or from revenue officers, are first to be paid, in cases of insolvency, assignment, &c. He contended, that the collector, whose duty it was to recover the duties, had no election to proceed against the bankrupt or the assignees; but was bound to call on the assignees, and claim the whole debt, out of the fund in their hands; and this was the construction most beneficial for the United States. Upon the other supposition, instead of having a preference, they would be in a worse condition than a common creditor: for if not barred by the certificate, then they would be unable to come in under the commission, upon the effects assigned, and be put to their remedy against the person of the bankrupt, stripped of every means of payment; and must, nine times in ten, lose their whole demand. The king, he said, was not bound by the statutes of bankruptcy, because not named; and therefore an extent served on the property of the bankrupt, will bind from the teste of the writ, and till actual assignment by the commissioners: but the king is bound by an actual assignment; because the property is then actually vested in another. Cooke, Bankr. Law, 392; Id. (Ed. 1786) 246. See W. Jones, 202; 2 Show. 480. An assignment, then, on the supposition that the United States are not bound, will divest the property; and instead of a preference, they will have to look to the bankrupt, without property, and deprived of the means of future acquirements. The thirty-fourth section enacts, "that every such bankrupt shall be discharged from all debts by him or her due or owing at the time of becoming bankrupt, or which might be proved under the commission, and may plead his certificate in bar," &c. [1 Story's Laws, 744; 2 Stat. 30.] The terms here used, are universal; they discharge him from all debts; and unless the debts of the United States are specially and clearly excepted, he ought not to be held liable. As to those words in the sixty-second section: "That nothing in the act should be construed to lessen or impair any right to, or security for money due to the United States, or any of them,"—he considered them not as designed to exclude the bankrupt from the benefit of his certificate as against the United States, so far as respected his person and future effects, but merely to express by way of caution, that, however in respect to the debts or securities for debts of private creditors, the provisions of the act might tend to lessen or impair their rights, yet in regard to moneys due to the United States, or to securities for such moneys, they should remain in full force, to their full amount against the bankrupt's property in the hands of the assignees. He observed, that the legislature would, in all probability, have used a very different form of expression, if the intention were different from that which he assumed as the true construction. They would have said expressly, "that nothing in the act should be construed to exonerate the person or effects of the bankrupt from debts due or owing to the United States."

Mr. Ingersoll, for defendant, said that no expressions could have been devised, more comprehensive or significant, than those used in the concluding sections of this act, to exempt and except out of all its provisions, the liens, preferences and contracts between the United States and the bankrupt. The words

are, "that nothing in the act shall be taken or construed, to lesson or impair any right to, or security for money due to the United States, or any of them." If this act is construed so as that the debtor be discharged under the certificate, in his person and future effects, from demands of the United States; would not this be to lessen the security for the money due to the United States? The security for the money is the person and property of the debtor, and his future acquisitions. These are all taken from the United States, if it be held, that they are bound by the act. The consequence which it is supposed must flow from this construction, namely, that the United States will be in a worse condition than the other creditors, if not within the act, as thereby, the property will be assigned, and their remedy lie only against the person and future effects of the bankrupt, will not exist. The assignment, as to their debts, will not destroy their preference; for this act expressly reserves to the United States the right of prior satisfaction given by any former law. So that debts due to the United States must be first satisfied, before the general creditors, or the assignees, can take under the assignment; and the property will be liable in the hands of the assignees.

TILGHMAN, Chief Judge. We regret that so important a question should be brought up for determination, in the course of a trial, upon an objection to a witness. It must, however, receive an answer. Upon the best consideration which the circumstances will permit us to bestow on the point, we are of opinion, that debts due to the United States are not within the provisions of the bankrupt law; but that the debtor, his lands and effects, present and future, are liable to actions and remedies for the recovery, as before the passing of that act. The sixty-second section of the law seems decisive. The consequence is, that the witness must be rejected, for it is plainly his interest that the United States should recover. in this action against James King, the moneys due on the judgments and executions against himself and partner. For, as against James King, (whose debt against the house will be revived) he may plead his certificate in bar; but should the United States fail to recover the debt in this way, his person and future effects may be made liable to their suit on the judgments.

THE COURT gave no opinion on the other objection to the witness.

The question of fact litigated on the trial, was, whether the house of Johnson and King was insolvent on the 15th May, 1799, when the assignment of the wines was made to James King the defendant, in satisfaction of a precedent debt to him, for goods and moneys advanced to the house. On the part of the United States, it was asserted, that the house was in failing circumstances in the fall of 1798, and became insolvent, and stopped business in the course of the winter. That this assignment was made to the father of one of the partners on the 15th May, 1799, after the date of the custom-house bonds to the United States, on which judgments had been obtained, and for which the executions had been levied on the wines in question.

Mr. Rawle, for the United States, cited the several acts of congress which provide, that in cases of insolvency, &c. debts due to the United States, shall be first paid. See [1 Stat. 169, § 45; Id. 263, § 18; Id. 515, § 5; 2 Stat. 676, § 65]. By this last act, which seems to embrace the former provisions, and to define them, it is enacted, that where any bond for the payment of duties shall not be satisfied on the day it may become due, the collector shall, forthwith, cause a prosecution to be commenced for the recovery of the money, &c. "And in all cases of insolvency, or where any estate in the hands of the executors, administrators or assignees, shall be insufficient to pay all the debts due from the deceased, the debt or debts due to the United States, on any such bond or bonds, shall be first satisfied; and any executor, administrator, or assignee, or other person, who shall pay any debt due by the person or estate from whom, or for which, they are acting, previous to the debt or debts due to the United States from such person or estate being first duly satisfied and paid, shall become answerable in their own person and estate, for the debt or debts, &c. and actions may be commenced, &c. and the cases of insolvency mentioned in this section shall be deemed to extend as well to cases in which a debtor, not having sufficient property to pay all his or her debts, shall have made a voluntary assignment thereof, for the benefit of his or her creditors, or in which the estate and effects of an absconding, concealed or absent debtor, shall have been attached by process of law, as to cases in which an act of legal bankruptcy shall have been committed."

Several witnesses were examined on the part of the United States, who proved that in the fall of 1798 the house was greatly embarrassed, their notes at the bank protested, and renewed again by the same endorsers·on small payments; previous to the assignment for some months, they made no purchases, and there remained on hand of goods at that time, but an inconsiderable stock. They met with very great losses at sea, and from the whole evidence, it was pretty clear that the house was insolvent on the 15th May, 1799, when the assignment to the defendant in payment of his debt, was made. However, until the 1st June following, they continued to pay debts; and actually paid off, after the assignment, debts to the amount of near 8,000 dollars; but on the 1st June, 1799, they applied to their creditors for and obtained a letter of license, &c.

On the part of James King the defendant, it appeared, that he was a bona fide creditor

to the amount of his assignment: it did not appear that he knew the house was actually insolvent, when he took the assignment: though he knew of their difficulties, and might reasonably apprehend his debt to be in danger, unless secured.

Mr. Rawle, for the United States, stated that the only question for the jury was, whether the house of Johnson and King, were solvent or insolvent, on the 15th May, 1799, the date of the assignment. If insolvent, then, he maintained the assignment was void as against the debt of the United States; being in destruction of their preference in such case, under the acts of congress; and from the whole evidence, said it was very clear that on the 15th of May, 1799, they were unable to pay their debts, and had been so ever since.

Rawle cited the following cases: Cockshot v. Bennett, 2 Term R. 763, that a subsequent promise, founded on a prior fraudulent consideration, was not good. 3 Term R. 551; 4 Term R. 167; 6 Term R. 146, where debts secured to particular creditors, in breach of confidence, and general rights of other creditors, who came into friendly accommodations with the debtor, were held void.

Ingersoll & Hallowell, contra, for defendant, argued, that admitting it could be ascertained with certainty, the house at that period stood debtor beyond its ability to pay; yet it was a misconstruction of the acts of congress, from thence to conclude, that all payments, assignments, and bona fide transfers of the debtor, were to be over-reached, in favour of the preference given to the debts of the United States. That congress never intended to interpose a preference as against other creditors who received satisfaction from the debtor in the course of trade and business, and before the debtor had become notoriously insolvent; by assignment of his effects to trustees for the benefit of his creditors; or had committed an act of bankruptcy, or his property was attached, or some other decided, and unequivocal act of inability to pay, was manifested. The consequences of a different construction, they alleged, would be pernicious in the highest degree. As to the general right of a debtor, to prefer a particular creditor in such case, they said there was no doubt, and cited 8 Term R. 528, where an assignment to trustees to pay particular creditors was held to be valid.

TILGHMAN, Chief Judge (charging jury). At common law, a debtor, though insolvent, may prefer a creditor. He may assign all, or any part of his effects in satisfaction of a bona fide debt, in exclusion of all other creditors. The bankrupt laws, and particular statutes, however, in particular cases, have interfered in favor of the general creditors, or some particular description of debts: and taken from the debtor his right of preference. In this case, the right of the defendant under the assignment, as against the United States, is not affected by the bankrupt law. But it has been contended, that the special acts of congress giving to debts due to the United States upon bonds for duties, a preference of payment in cases of insolvency of the debtor, will avoid the assignment: because at the time of the assignment, as it now appears from the evidence, the house was unable to pay its subsisting debts.

We are clearly of opinion, that it is not every case of actual insolvency, which is within the words or intent of the acts of congress. Traders in business, and continuing so, may be really insolvent: they may be so unknown to themselves, and frequently unknown to mankind. It would be productive of the greatest injustice, and serve to embarrass and check mercantile transactions, if the right of a creditor to retain his payment, or transfer of property in payment, as against custom-house bonds, was to depend upon a future scrutiny on the part of the United States, into the actual condition of the debtor's affairs, at the time of the payment, sale or assignment: it would lead to inextricable difficulties. Our opinion is, that the act of the 2d March, 1799, in its terms and meaning, only gives a preference as against other creditors, on custom-house bonds, after a notorious act of insolvency; as where the debtor has assigned for the benefit of his creditors; where he has absconded, and his property is attached. &c. In the case before us, although when the assignment was made, it is probable the house was really insolvent, yet no act of bankruptcy had been committed; no assignment made to any one creditor of all the effects; no attachment had issued; no transfer made to assignees for the benefit of all, or any particular creditors;—the house continued in business, and, though greatly embarrassed, paid debts until the 1st June. The defendant does not appear to have been privy to, or an agent in any fraud; but received the wines as a security for a bona fide debt: this, therefore, is not a case of insolvency within the acts of congress, under which the United States can claim a preference, so as to avoid the assignment made to the defendant.

The jury found a verdict for the defendant.